# Herbert S. Walsh et al., Appellees, v. North American Cold Storage Company, Appellant.

## Gen, No. 16,528.

1. MECHANIC'S. LIENS—*when decree not disturbed.* A decree awarding a mechanic's lien will not be disturbed if predicated upon the report of a master approved by the court, unless it appears either that errors of law have intervened or that the findings of fact or some of them are clearly and palpably against the weight of the evidence.

2. MECHANIC'S LIENS—*when architect's certificate not essential.* A decree awarding a mechanic's lien will not be disturbed notwithstanding no final certificate was issued by the architect as provided for in the contract which formed the basis of the action, if it appears that the work had been accepted by the architect and that the issuance of the final certificate was deferred in deference to the owner.

Appeal from the Circuit Court of Cook county; the HON. THOMAS G. WINDES, Judge, presiding. Heard in this court at the March term, 1910. Affirmed. Opinion filed May 21, 1912.

L. A. STEBBINS, for appellant; MAYER, MEYER, AUSTRIAN & PLATT, of counsel.

SAMUEL J. LUMBARD, for appellees.

MR. JUSTICE CLARK delivered the opinion of the court. This appeal brings up for review a decree entered in a mechanics' lien case. The petition was filed by the appellees, Herbert S. Walsh and Michael C. Masterson, doing business as Walsh & Masterson, against the appellant, North American Cold Storage Company, and sundry other individuals and corporations who were charged to have an interest in the subject matter as contractors, sub-contractors, trustees under mortgage, holders of notes upon the mortgage, etc. The only lienors, however, who prosecuted the suit to effect were the appellees, Walsh & Masterson, and the American Bridge Company of New York. By

the decree the former were awarded the sum of $8,713.20 and the latter $20,848.69. These amounts included interest from the dates that the contracts respectively were found by the master to have been completed, to the date of the master's report, and also interest upon the amounts found to be due by the master from the date of his report to the date the decree was entered by the court. It was also ordered that the appellant pay to the appellees Walsh & Masterson $385.63 and to the Bridge Company $1,320.30, being the sums paid by them respectively to the master as fees.

The appellant, North American Cold Storage Company, in 1904 undertook the building of a large addition to its warehouse on North Canal street in the City of Chicago. Contracts were made with different independent contractors for various portions of the work. The contract entered into with Walsh & Masterson was for what was known as the sub-structure work, and that with the Bridge Company was for the steel work. The former contract was entered into on May 5, 1904, and the latter on June 9, 1904. The appellant also entered into three contracts with Carlson & Dunning, made respectively in June, August and October, 1904. These contracts were for mason work, tearing down a wall, etc. The addition to the building covered a space of about 60 by 60 feet, the old structure being about twice as long as and of equal width to the addition. The old structure was 15 stories in height, and the new 16 stories. There was no place for the storage of material to be used in the construction of the building except on the site itself, and material could only be delivered at the site at about the time the several contractors were ready to make use of it. Because of the difficulties in the way of contractors who were doing different portions of the work at the same time, and because of the lack of space for materials, a great many practical and serious difficul-

Walsh v. North Am. Cold Storage Co., 170 Ill. App. 393.

ties were encountered in the construction of the building.

The contract of Walsh & Masterson provided that the work thereunder should be completed by June 5, 1904. The testimony tended to indicate and the master found that the work was completed on August 4, 1904; that this work was done by them to the satisfaction of the architect named in the contract, and that they furnished material and did extra work at the request of the appellant, the reasonable value of which was $791.13. The master further found that subsequent to the making of the contract with Walsh & Masterson changes were made by the appellant in the original drawings or plans; that the new plans were furnished some time during the month of June, 1904. There was testimony to the effect, and the master found, that during the progress of the work a change was again made in the plans, which necessitated the re-arranging of a row of piers and slight other changes, which required Walsh & Masterson to go further out into the river in building the dock and cofferdam in order to protect the foundations. It further appears that delay was caused because of the fact that the appellant did not obtain permission from a railroad company to excavate under the tracks west of the foundation, until about June 30, 1904. It appears that on June 8, 1904, Mr. Abbott, the architect, wrote to Walsh & Masterson notifying them that the contract time had expired for the completion of the work, and requesting them immediately to proceed to do certain work required of them under the contract. Letters were written by the appellant in June and July, complaining of the delay in the completion of the work, and to these letters Walsh & Masterson replied, in one letter giving as their reason for not proceeding with the excavation that it would be very dangerous to attempt to start it on so small a lot while the pile driver was being operated, and giving as a reason for

not driving the sheet piling on the west end of the lot that the appellant had not arranged to divert the C. M. & St. P. trains, which would have to be done before the piles could be driven. The master in his report states that he was unable to determine the exact amount of delay that was caused by changes in the plans. He finds, however, that there was due Walsh & Masterson from the Storage Company the sum of $6,791.13, after the allowance of $5,000 theretofore paid by the Storage Company. This amount of balance is admitted by the appellant to be correct. On August 30, 1904, the architect referred to wrote Masterson to the effect that the work done by his firm was acceptable and that they were relieved from any responsibility touching the work should it be damaged by other contractors or by vessels passing along the river. Although demand was made for what is called a final certificate, no such certificate was issued, unless the letter referred to can be treated as such. The fact that no such certificate was issued is not relied upon by appellant as ground for reversal.

From the testimony the master found that the American Bridge Company of New York employed the American Bridge Company of New Jersey to do most of the fabrication of the material which was used in the building; that the plans and specifications were prepared by the architect and submitted to the American Bridge Company of New York, the plans then being sent to the drafting department of the Detroit plant of the New Jersey corporation; that some of the drawings were not received at the Detroit drafting department until the month of September, 1904. The amount to be paid to the American Bridge Company under its contract was $41,000, and the work was agreed to be completed by September 1, 1904. The master found that the delay, changes, and lack of information from the appellant, resulted in considerable delay in the drafting of the shop drawings, and that

thereby the time taken for the purpose of completing the working or shop drawings was prolonged about a month beyond what it ordinarily would have taken. The master further found that there were changes made in the plans of the architect subsequent to the entering into the contract with the American Bridge Company of New York, and some time during the progress of the work on the building; that these changes caused delay, the exact amount of which it was impossible from the evidence to determine; that it was impossible for the American Bridge Company of New York to proceed with the work until certain dimension stone, to be laid, as we understand it, by Carlson & Dunning under their contract, had been set on top of the piers heretofore referred to; that therefore the American Bridge Company could not commence its portion of the work on the building until August 8, 1904.

It appears that the erection of the steel work on the addition was done by Oscar Daniels Company under a sub-contract with the American Bridge Company of New York; that the Daniels Company acted on the theory that it would be able to place a derrick upon the roof of the building belonging to the appellant and to which the addition was being constructed; that negotiations were had with reference to the use of this roof with Mr. Denman, the superintendent of the cold storage plant; that Mr. Denman stated he could see no objection to using this roof, providing the company could be guaranteed against damage resulting therefrom, but that he would not give his consent without consulting the president, Mr. Johnson, who was in California; that all negotiations concerning the use of the roof failed, and on September 9, 1904, the Bridge Company proceeded to erect the derrick on the site of the new building, and that this derrick was completely erected and ready for work on September 15, 1904.

The master further found, and there is testimony to support the finding, that it was originally the intention to use the derrick (placed on the roof of the old building) in setting the grillage beams, and there being no available place other than the roof of the old building for the derrick, it was necessary to set these beams by hand, which was done; that it was impossible to place the derrick on the site of the building before September 12, 1904, owing to the condition of the foundation and the work going on prior to that time, which was being performed by others than the Bridge Company or its sub-contractor; that the Bridge Company was delayed in the erecting work by the fact that the north brick wall of the old building was not removed in time to permit the constructing gang to make connections at the columns of the old building, which were inside of this brick wall, with the floor beams of the said addition, as they went along. The work of tearing down this wall, as heretofore stated, was contracted to be done by Carlson & Dunning.

The master found that the building could have been erected in five or six weeks' time if the derrick had been placed on the old building and connections made, whereas it took twice that length of time under the conditions as they existed, the wall not having been taken down and the Bridge Company not being allowed to use the roof of the building for the derrick.

There is testimony to support the finding, and the master found, that subsequent to the time when the Bridge Company began the erection of the iron work it proceeded with its work with due expedition until November 23, 1904; that at this time there remained certain work under the track west of the building in the basement, and connected with the old wall of the building, which work was not completely performed until December 17, 1904; that this work was delayed through no fault of the Bridge Company, but because

of conditions which existed at that time, for which it was not responsible.

The master found that there was extra work performed by the Bridge Company, amounting to $477.02; that the balance left due on the contract, and for extra labor and material, after deducting the sum of $25,000 theretofore paid by the appellant, was $16,477.02; and the correctness of this finding is admitted by appellant in the appendix to its brief.

On December 17, 1904, Mr. Johnson, president of the appellant company, wrote the Bridge Company as follows:

"Replying to your favor of December 13th, would say that I should be very glad indeed to send you the balance of your contract, were it not that Walsh & Masterson, against whom we have brought suit for delay in their contract, have made you parties to their suit for the balance of their money. Under these circumstances I trust you will appreciate my position, and we will hope for a speedy trial and determination as to just where the responsibility does lie for the delay in the completion of this building. As we have frequently written you, it has been a very serious proposition with us, and it has put us to much additional expense. Personally, I feel that some of this delay was caused by Walsh & Masterson, and some by the American Bridge Company. As to just the proportion, I will of course be unable to say without going into the matter at some length and detail. I am sure that I am more anxious than you can be to pay you and have the matter settled."

As in the case of Walsh & Masterson, no formal final certificate was given by the architect to the Bridge Company, but on January 20, 1905, the following letter was written:

"I herewith accept the character and quality of the erection work as performed by the Oscar Daniels Company in the erection of the structural steel frame for

a sixteen story addition to the North American Cold
Storage Company's building, at Canal & Kinzie street,
but this acceptance is not to be construed as an accept-
ance of the work as to the limit of time in which the
work of erection was to be done.''

It appears that one Alexander C. Warren had con-
tracted with the appellant to lay the reinforced con-
crete floors and the roof of the building; that he was
delayed so that he was unable to do the work until the
winter time; that he originally filed a claim for $4,000
on account of such alleged delay, but that this claim
was afterwards abandoned; that a final settlement was
made between Warren and the Storage Company in
the spring of 1905, and that he was paid the balance
due on his original contract price and allowed the sum
of $2,397.35 for delay; that at the time of the final
settlement a contract was entered into by Warren and
the Storage Company and one F. K. Pennington, who,
it would seem, was acting in the interest of the Stor-
age Company. From this contract it would appear
that the claim of Warren in the present proceeding
was to be prosecuted as though no settlement had been
made; that the expense of the conduct of the case, in-
cluding the fee of the attorney who had appeared on
behalf of Warren, should be borne by the Storage
Company, and that whatever amount should be. al-
lowed Warren in the litigation because of the delays
should be divided in a manner fixed by the contract
between the parties to the contract. The contract
specifically provided, however, that the Storage Com-
pany might settle its controversy with Walsh & Mas-
terson and the American Bridge Company in whatever
way it deemed best, without reference to Warren or
his rights in the premises. A similar contract seems
to have been entered into between the Storage Com-
pany and Carlson & Dunning. The Warren claim was
not pressed before the master, and that of Carlson &
Dunning appears to have been settled by the payment

of their original contract price in full. Testimony
was offered before the master to substantiate the claim
of Carlson & Dunning for damages due to delay, the
total amount claimed being $4,445.

As heretofore stated, it is not claimed by the appellant that Walsh & Masterson were not entitled to recover because no final certificate of the architect was
given them. The same concession is not made, however, with respect to the claim of the American Bridge
Company. It is still insisted by the appellant that no
recovery may be had by it because no final certificate
was granted.

As to both claims, it is insisted by the appellant
that the appellant showed before the master damages
for delay, for which Walsh & Masterson and the American Bridge Company of New York were responsible,
in the sum of $84,824.65. The claim is made up as
follows:

"Paid to Warren (Warren's testimony,
    1075-340) .............................$ 2,379.35
Loss in labor efficiency of men working for
    Storage Co. direct, after Jan. 1/05, laying concrete during cold weather ......    5,000.00
Loss to Storage Co. by reason of the fact
    that the concrete work they did with
    their own labor was ragged and uneven
    on account of the cold weather.........    2,000.00
There were 530,000 cubic feet of space in
    the new building (Johnson's testimony,
    1136-364). The reasonable rental market value of 1 foot of cubic space for 1
    year was in the winter of 1904-5 12 cents
    (Johnson's testimony, 1182-379, 1358-
    450.) The value of 530,000 cubic feet of
    space of the character in question in
    1905, for 5 months was ..............  26,500.00
There was a loss of the use of one half of
    the space in the old building for 5
    months (Johnson's testimony, 1182-

379). The total cubic space in the old building was 700,000 cubic feet (1138-364); one half of same—350,000 cubic feet; value of 350,000 cubic feet of space for 5 months, at 12 cents per annum per foot ............................... 17,500.00

(The total cost of operating the combined plant, including the addition, is substantially the same as the operation of the old plant before the addition was erected (Johnson's testimony, 1139-364, 1145-366, 1152-368, 1157-370). Therefore the Storage Company is entitled to recover the reasonable market value of the refrigerated space without any deduction for the cost of refrigerating, and it is so computed in the last paragraphs.) The top floor of the new building was designed to install a butter renovating plant which the Storage Co. had purchased for that purpose (Johnson's testimony, 1172-375), but by reason of delay in completion of said building it lost the good-will of said plant that it had purchased, and lost the season's business of 1904-5 (Johnson's testimony, 1168-374, 1169-373). Thereafter it became impracticable by reason of such delay to install the plant, and the plant was sold piece by piece for scrap or old iron, for the sum of $3,000 (Johnson's testimony, 1174-374). It cost $5,000 more to build the building with the top floor designed for the installation of the butter renovating plant than it would have cost to erect the whole building for storage purposes only. (Johnson's testimony, 1171-374). The butter renovating business was worth $15,000 in the fall of 1904 (Johnson's testimony, 1162-372); the good-will that went with the plant was

worth conservatively $10,000 (John-
son's testimony, 1164-372) ; and, there-
fore the total damage to the Storage Co.
incurred by reason of this transaction
was .............................. 27,000.00

$80,379.35

To the above should be added the dam-
ages, if any, allowed to Carlson & Dun-
ning against the Cold Storage Co. upon
their cross-bill, the total damages
claimed by Carlson & Dunning in said
cross-bill being ..................... 4,445.30

$84,824.65."

It appears that an architect's certificate dated No-
vember 16, 1904, is to the substantial effect that $20,000
was then due, less a payment of $10,000 theretofore
made. This certificate further showed that a balance
of $6,000 would be due upon the completion of the
work. The master found and, we think, properly, that
the architect's acceptance of the work, together with
the certificate of November 16, 1904, was sufficient to
comply with the requirements of the contract as to a
final certificate; that from these two documents no
other conclusion could be reached than that the work
was accepted by the architect, and that there was still
$16,000 due after the payment of the said $10,000. In
other words, the point attempted to be made by the
appellant, that the Bridge Company may not recover
because there was no final certificate issued by the
architect, is not well founded.

The concluding portion of the master's report is as
follows:

"3. With reference to the question whether said
Storage Company is entitled to damages by reason
of the delays in the completion of the work of the said
Walsh & Masterson, and of the American Bridge Com-
pany of New York an immense amount of evidence

has been introduced bearing on that question, and a great number of legal questions have been discussed. It would be impracticable to discuss that evidence and those legal propositions in detail. In my opinion, before the Storage Company can be entitled to any damage, by reason of the said delay, it must show, with at least a fair degree of accuracy, the amount of damage occasioned by each of said contractors, and it must be able to trace that particular damage directly to one or the other of said contractors, and show that such damage was or ought to have been in contemplation of the parties to said contracts, when the same were entered into. It should also appear that such damage was not attributable to any fault on its own part. The burden of proof as to these matters is on said Storage Company.

4. The architect in this case was not intended by either contract to act as an arbitrator, with reference to the amount of delay, if any, or the amount of damage resulting from such delay; and even if he had been made such arbitrator, his conduct and that of Mr. Johnson, the president of said Storage Company, would have deprived him of any right or duty. I do not intend to impute any improper motive to said architect. His duty, in one sense, was to protect the interests of his employer, particularly as he was not made an arbitrator, by the terms of the contracts; but, if he could be regarded as an arbitrator, his evident interest on behalf of the Storage Company, and Mr. Johnson's interference and assumption of the duties of the architect, in many respects, would have disqualified the architect to act as an arbitrator. It was the duty of the architect, on application of either contractor, made at the time, to certify to what additional time should be granted; but, in my judgment, this provision of the contract, as also that one giving to the Storage Company the right to take over the work in case of delay, were waived by the action of the parties, or failure to act under such provisions, by all parties concerned. These provisions of the contracts gave to each party a privilege only, which privilege was not

taken advantage of by either, although all had actual knowledge of the conditions existing, which may have given the right to exercise the privilege.

5. The contractor and the owner of the building were each protected in case of delays by these two provisions of the contracts, but none saw fit to act on their right in that regard. All assumed to go ahead without protest on the part of anyone, without regard to their privileges, rights or duties, under those provisions. These waivers, however, in my opinion, would not prevent either party from claiming any legal damage to which they might be entitled by reason of such delays.

6. With reference to Walsh & Masterson, it is impossible to tell whether or not the delay on their part was occasioned wholly, or in part, by the delay in the delivery to them of the altered plans, or by the changes in the work, which they had to perform; nor (if only in part) how much of the delay was attributable to those causes.

7. As to the Bridge Company, if it had had access to the work at the time contemplated by the contract, it could have completed its part of the work within the time limited; certainly it could have done so, had it not been for the delays occasioned by reason of the unforeseen difficulties encountered during the progress of its work. It was the duty of the Storage Company, to do all in its power, within reason, to have the work preceding the work of the Bridge Company, in such a state that the Bridge Company could proceed as soon and as rapidly as possible. It did not insist upon its right to take over the work of Walsh & Masterson, and that fact tends to justify the inference that the contractors were doing all in their power to expedite the work. While it might waive that right, so far as its own interests were concerned, it could not do so, if by so doing it worked an injury to subsequent contractors. As before found, the Bridge Company proceeded with its work, as rapidly as could be expected, under the conditions existing.

8. While, in my opinion, the evidence does not es-

tablish the custom in the trade, with reference to the use of the roof of the adjoining building for the derrick, which is claimed by counsel for the Bridge Company, still, the Storage Company, aside from the existence of a technical custom of that kind, was under obligations, to allow the said Bridge Company (particularly under the conditions existing at the site) to use the premises under its control, in any manner, which would give to said Bridge Company the advantage of any usual and ordinary methods of utility and practice, in connection with the work necessary to be done, which would facilitate its work, provided that no damage would result to the Storage Company thereby. The proof shows that the use of said roof would not have resulted in any damage to exceed $100 and the Bridge Company offered to guarantee said Storage Company against any damage or loss of any kind, which offer was refused. The Storage Company could not thus place an unnecessary and unreasonable obstacle in the way of the prosecution of the work of the Bridge Company, and then seek to hold it liable for damage resulting from its own unreasonable and unjustifiable position. The adjoining building was practically a part of the premises on which the work was to be done, and a refusal to permit the use of the roof under the existing circumstances was just as unjustifiable as if the owner of a building should contract to have work done in a certain portion of the building, and then should refuse to allow the contractor to go upon or place his material or tools on any portion of the building except the particular spot where the work was to be done. If the owner of a small congested area of ground, such as this was, who owned the land completely surrounding that site, should refuse to allow a contractor to make use of any of that land for material or tools or implements or machinery needed in the erection of the structure proposed to be erected on the inconvenient and congested site, surely no court of equity would permit that owner to collect damages for delay in the erection, arising from the inconvenience

and impossibility of working to.advantage under such conditions.

9.  Even if the said Storage Company was entitled in equity to recover damages in this case, in my opinion, the evidence is not of a character to justify the court in finding, as a fact, that the entire building could have been completed by January 1, 1905.  The only evidence in that regard is the testimony of Mr. Johnson, and he was not, in my opinion, sufficiently qualified with reference to all of the different trades involved, to give a reliable opinion, as to just how long it might take each contractor to complete his particular contract.

10.  It may be that the Storage Company could have hastened the completion, if contracts had been made earlier, or if it had exercised the privilege (which it had under some of the contracts, at any rate) of taking over the work and completing it itself.  It knew of the delays, and yet permitted things to go on without taking advantage of that privilege, and before it can charge up damages to any one contractor, growing out of delay on the part of a preceding contractor, it should appear that every reasonable effort was made to hasten the work.

11.  A number of contracts for work and materials which would seem to be essential for the operation of the plant were not entered into until March, 1905, and the work under some of these contracts was not to be completed for from thirty to sixty days.  Indeed, it appears that the elevators were not in fact completed until August 11, 1905, and it would seem that the building could have been of no practical use until the elevators were all in running order; and no reason is shown why they were not completed earlier.

12.  It would seem that these contracts could have been made much earlier, and that, if so, the work under them might have been completed much earlier than they were in fact completed.  The evidence fails to show that these later contracts could not have been completed in a shorter time, particularly if they had been made at an earlier date.  There is so much in-

definiteness and uncertainty as to these matters, that the court would not be justified, on the mere opinion of Mr. Johnson, in finding as a fact that the delay in the final completion of the plant, so that it was ready for operation, was all occasioned by the said delays in the work done by said Walsh & Masterson and the American Bridge Company of New York, nor with any sort of exactness, how much of the whole delay was chargeable to said last named parties.

13. Nor is it possible to ascertain with any degree of accuracy, just how much of the delay in the ultimate completion was chargeable to Walsh & Masterson, nor how much to said Bridge Company.

14. In my opinion, said Johnson was not qualified as an expert with reference to all of these different kinds of work, to such an extent that his opinion alone should suffice to inflict the heavy damages claimed in this proceeding.

15. Moreover, on the question of the amount of the damages, the evidence is too indefinite and uncertain to justify finding that any certain sum is properly chargeable to one and the balance to the other of said two contractors.

16. I am of the opinion also, that the proper measure of damages has not been adopted by the solicitor for said Storage Company, as to a portion of the damages claimed, particularly as to the rental value. The proof offered shows practically the profits (under the guise of the rental value of storage space per cubic foot) which the Storage Company could have made, rather than the rent which could have been obtained for the building as a whole, if rented to some one other than the Storage Company.

17. What has been said before, makes it unnecessary, in my opinion, to discuss at length the claims of Warren & Company and of Carlson & Dunning, for damages. If said Storage Company have failed to show that it is entitled to damages as against Walsh & Masterson and the Bridge Company, it surely cannot purchase claims made against it by said subsequent contractors, and attempt to prove up such damages

against itself for the purpose of recovering such additional damage against Walsh & Masterson or the Bridge Company.''

The record in this case is very voluminous, the abstract containing more than one thousand pages. The appellant has submitted a brief and a reply brief, which together comprise nearly 450 pages. After having carefully perused the abstract and the briefs filed, we are of the opinion that the decree should be affirmed. In our judgment no good purpose would be served by a lengthy discussion of all the points raised in the briefs.

The claim is made that interest was improperly allowed upon the claims. The allowance of interest and the method of computing the same were proper. McDonald v. Patterson & Co., 186 Ill. 381; Ruddy v. McDonald, 244 Ill. 494; Sections 2 and 3, Chapter 74, Revised Statutes.

It is claimed by the appellant that the requisite architect's certificate was not issued to the Bridge Company. We think the master in his report correctly found that the two certificates which were issued, and which heretofore have been referred to were all that were required to be furnished. It is quite apparent from the record that no formal final certificate was granted because the architect felt it his duty to see Mr. Johnson, the president of the appellant, and obtain his permission, which permission Mr. Johnson refused to give. We regard the case of McDonald v. Patterson & Co., *supra*, and the cases therein cited, as controlling upon this point.

We fully agree with the master in his conclusions on the questions of delay and the responsibility therefor. In our opinion the proofs do not show that the appellant is entitled to any damages as against the appellees for delays in the completion of the work. Even if damages were to be allowed, we do not think

that the proofs offered by the appellant afforded any basis for assessing damages as against the appellees, or a division of the same if assessed.

Cross-errors have been assigned by the appellees because attorneys' fees were not allowed them. The provisions of section 17 of the Mechanics' Lien act, in so far as it allows a lien holder to recover an attorney's fee, to be taxed as part of the costs, is unconstitutional, being in violation of section 22 of Article IV. Manowsky v. Stephan, 233 Ill. 409.

For the reasons stated the decree will be affirmed.

*Affirmed.*